**YAMAHA MOTOR CORP., U.S.A., et al., Plaintiffs,**

**v.**

**UNITED STATES of America, et al., Defendants.**

**Civ. A. No. 91–2125 (CRR).**

United States District Court, District of Columbia.

Dec. 19, 1991.

Dennis Meyer, with whom was Thomas Peele on the brief of Baker & McKenzie, Washington, D.C., for plaintiffs.

Stuart D. Gibson, Tax Div., U.S. Dept. of Justice, Washington, D.C., for defendants.

## MEMORANDUM OPINION

CHARLES R. RICHEY, District Judge.

Plaintiffs Yamaha Motor Corporation, U.S.A., and Yamaha Parts Distributors, Inc., (hereinafter "Yamaha") allege that the Defendants United States of America, the Internal Revenue Service, and various individuals in their official capacities acted arbitrarily, capriciously and in an abuse of discretion by refusing to enter into negotiations with the Japanese government upon the Plaintiffs' invocation of the Double Tax Treaty.[1] Invoking the Court's power to enforce the Treaty, the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*, and 28 U.S.C. §§ 1331 and 1340, the Plaintiffs petition this Court: (1) to issue a declaratory judgment that the Defendants violated the Double Tax Treaty; (2) to compel the Defendants to consider the merits of the Plaintiffs' request for negotiations; and (3) to enjoin the Defendants from interfering with the Treaty process and especially to enjoin litigation now underway in the United States Tax Court. *See* Complaint at 13–14. Pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6), the Defendants move to dismiss the case, claiming that the Court lacks subject matter jurisdiction over this action due to the Anti–Injunction Act, 26 U.S.C. § 7421, and the Declaratory Judgment Act, 28 U.S.C. § 2201. Upon consideration of the Defendants' Motion, the Plaintiffs' response thereto, the applicable law, the record herein, and the claims presented at the oral argument on December 17, 1991, the Court grants the Defendants' Motion to Dismiss pursuant to Fed.R.Civ.P. 12(b)(1).

In considering the Motion to Dismiss, the Court must construe the Complaint liberally in favor of the Plaintiffs. *See* 5A C. Wright & A. Miller, *Federal Practice and Procedure*, § 1350 at 218 (1990) (and cases cited therein). However, the Court is not required to draw argumentative inferences in favor of the Plaintiffs. *Id.*, citing *Norton v. Larney*, 266 U.S. 511, 45 S.Ct. 145, 69 L.Ed. 413 (1925). Thus, for purposes of this Motion, the Court assumes that the Defendants wrongfully refused to entertain Plaintiffs' request for competent authority assistance under the Double Tax Treaty.[2] Despite this premise, however, the Defendants must prevail.

1. *See* Convention Between the United States of America and Japan for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income, March 8, 1971, 23 U.S.T. 967, T.A.I.S. No. 7365.

2. Section 25(1) of the Treaty provides: "[1] Where a resident of a Contracting State considers that the action of one or both of the Contracting States results or will result for him in taxation not in accordance with this Convention, he may, notwithstanding the remedies provided by the national laws of the Contracting States, present his case to the competent authority of the Contracting States of which he is a resident. [2] Should the resident's claim be considered to have merit by the competent authority of the Contracting State to which the claim is made, it shall endeavor to come to an agreement with the competent authority of the other Contracting State with a view to the avoid-

The Anti–Injunction Act, 26 U.S.C. § 7421, explicitly provides that

> no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or not such person is the person against whom such tax was assessed.

In *Bob Jones University v. Simon*, 416 U.S. 725, 736–37, 94 S.Ct. 2038, 2046, 40 L.Ed.2d 496 (1974), the Supreme Court described the principal purpose of this provision of the Anti–Injunction Act to be

> the protection of the Government's need to assess and collect taxes as expeditiously as possible with a minimum of preenforcement judicial interference.

At bottom, the Anti–Injunction Act is designed " 'to require that the legal right to the disputed sums be determined in a suit for a refund.' " *Bob Jones, supra,* 416 U.S. at 737, 94 S.Ct. at 2046, citing *Enochs v. Williams Packing & Navigation Co.,* 370 U.S. 1, 7, 82 S.Ct. 1125, 1129, 8 L.Ed.2d 292 (1962). The Declaratory Judgment Act, 28 U.S.C. § 2201, also excludes actions "with respect to Federal taxes" from its purview. The scope of the Declaratory Judgment Act is at least as broad as the Anti–Injunction Act. *See Alexander v. "Americans United" Inc.,* 416 U.S. 752, 759, n. 10, 94 S.Ct. 2053, 2057, n. 10, 40 L.Ed.2d 518 (1974); *Investment Annuity, Inc. v. Blumenthal,* 609 F.2d 1, 4 (D.C.Cir. 1979), *cert. denied sub nom., First Investment Annuity Co. v. Miller,* 446 U.S. 981, 100 S.Ct. 2961, 64 L.Ed.2d 837 (1980). If the Anti–Injunction or Declaratory Judgment Acts apply to the instant case, the Plaintiffs cannot assert a claim under the Administrative Procedure Act. *See* 5 U.S.C. § 701(a)(1) (APA does not apply "to the extent that ... statutes preclude judicial review"); 5 U.S.C. § 702(1) (APA does not affect "other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any appropriate legal or equitable ground").

Because the underlying purpose of this action is to restrain the assessment or collection of taxes, the Court cannot entertain it. The desire to reduce the overall tax burden shines through as the real purpose of this case and derails the Plaintiffs' attempt to escape the Anti–Injunction and Declaratory Judgment Acts. *See Alexander v. "Americans United", Inc., supra,* 416 U.S. at 760–61, 94 S.Ct. at 2058–59; *Spencer v. Brady,* 700 F.Supp. 601 (D.D.C.1988). The prayer for relief in the Complaint makes this abundantly clear. *See* Complaint at 13–14. Moreover, Plaintiffs' argument evidences that they seek to proceed through the Treaty's Competent Authority mechanism immediately because they have determined that this process is the best means to limit their tax liability. Plaintiffs fear that a Tax Court judgment will make the United States adverse to compromise in these negotiations. According to Plaintiffs' theory, this recalcitrance on the part of the United States representatives will destabilize negotiations with the Japanese, causing the same income to be taxed twice to Plaintiffs. *See* Plaintiffs' Memorandum at 12–14. Plaintiffs also acknowledge that, by following the Treaty process from the outset, the negotiators "may agree on an amount of U.S. tax to be assessed different from the amount the Tax Court ultimately would have determined to be due." *Id.* at 14. Although there is no certainty that the overall tax liability will be reduced by following the Treaty route, Plaintiffs' dogged pursuit of immediate recourse to the negotiation process can only be explained by Plaintiffs' assessment that, on balance, this route represents the least expensive alternative.[3]

▆ Apparently in recognition of the constraints imposed by the Anti–Injunction Act, the Plaintiffs indicated their willingness to abandon their request to halt the Tax Court action, and to adjudicate the remaining claims. *See* Plaintiff's Memorandum of Points and Authorities in Opposition to the Defendants' Motion to Dismiss

---

ance of taxation contrary to the provisions of this Convention."

**3.** This is the only rational explanation, as Plaintiffs can still proceed through the Treaty apparatus after the Tax Court completes its review.

at 11, n. 11. The Plaintiffs' construction of the Complaint does not diminish the preclusive impact of the Anti–Injunction Act and the Declaratory Judgment Act, however, for the Plaintiffs' remaining claims are pre-enforcement claims "with respect to Federal taxes" and manifest a purpose of restraining the IRS in its plan to assess and collect taxes. The Plaintiffs still essentially ask this Court to direct the litigation strategy of the IRS such that the IRS would focus its energies on the Treaty negotiation process rather than on the Tax Court litigation. *See* Plaintiff's Memorandum at 8 (Plaintiffs "are seeking to ensure their access to a means of having their tax determined and assessed that is wholly separate from (but equally as valid as) the purely domestic-law procedures for determining and assessing tax"). The Anti–Injunction Act and Declaratory Judgment Act are meant to protect against this type of interference with the tax collector. Even if the Plaintiff does not dispute the dollar amount of tax liability,[4] the Anti–Injunction Act and Declaratory Judgment Act protect the overall pre-enforcement assessment and collection process—even the early strategic and investigative stages and even where the legality of the agency's action is in question. *See Reyes v. Lynch*, 83–2 U.S. Tax Cas. (CCH) ¶ 9510 (D.D.C. 1983) (Anti–Injunction Act bars action challenging legality of release of defamatory information about taxpayer in course of investigation), citing *Smith v. Rich*, 667 F.2d 1228, 1230 (5th Cir.1982) (ban on pre-enforcement involvement extends "not only to the assessment or collection itself, but ... equally ... to activities which are intended to, or may culminate in the assessment of taxes"); *cf. Bob Jones*, 416 U.S. at 739–740, n. 10, 94 S.Ct. at 2047, n. 10 (claim barred because it would "interrupt" the assessment and collection process).

Plaintiffs assert entitlement to bring this action on the basis of the exceptions recognized in *Enochs v. Williams Packing & Navigation Co., supra,* and *South Carolina v. Regan*, 465 U.S. 367, 104 S.Ct.

1107, 79 L.Ed.2d 372 (1984). These claims fail. First, in order to enjoy the *Williams Packing* exception, the Plaintiff must demonstrate (1) that "it is clear that under no circumstances could the Government ultimately prevail," *Williams Packing*, 370 U.S. at 7, 82 S.Ct. at 1129, and (2) that "equity jurisdiction otherwise exists" due to the threat of irreparable injury. *Bob Jones*, 416 U.S. at 737, 94 S.Ct. at 2046. Plaintiffs cannot meet this burden. First, it is entirely possible that the Government could prevail in its attempt to prevent Plaintiffs from immediate access to negotiations via the Treaty. For example, the Government could decide that the Plaintiffs' double tax claim has no merit, and could deny the request. *See* discussion, *supra,* note 2. Second, it is clear that the Plaintiffs do not have resort to equity jurisdiction. Plaintiffs do not face the danger of irreparable injury because they may still petition the IRS for Competent Authority assistance after the Tax Court completes its review and may thereby avoid double taxation. Plaintiffs could also defeat the deficiency assessment in the United States Tax Court *in toto.*

The fact that Plaintiffs must participate in the Tax Court process now and await its conclusion is not an irreparable injury. At worst, the litigation would increase Plaintiff's legal costs and may sully its reputation. Neither of these injuries are cognizable for purposes of equity jurisdiction. *See Bob Jones*, 416 U.S. at 746–747, 94 S.Ct. at 2050–60. The prospect that Plaintiffs' tax liability may be higher due to the United States' alleged recalcitrance in negotiations upon the entry of judgment in Tax Court is also not an irreparable injury requiring this Court to exercise jurisdiction. Aside from the fact that this allegation in Plaintiffs' Memorandum is entirely speculative, the Plaintiffs ignore the fact that the Treaty process itself contains no guarantee that double tax liability will be avoided. Thus, even if the Defendants permitted Plaintiffs to proceed directly to the negotiating table, the outcome may well be the same—if not worse. Injunctive relief cannot issue on

---

4. As discussed, *supra,* the Plaintiffs appear to have determined that the Treaty process is less

risky, as it creates the least chance of a huge tax liability at the conclusion of the process.

the basis of such an unsupported and hypothetical injury. *See State of Connecticut v. Commonwealth of Massachusetts,* 282 U.S. 660, 674, 51 S.Ct. 286, 291, 75 L.Ed. 602 (1931). *See generally* 11 C. Wright & A. Miller, *Federal Practice and Procedure,* § 2942 (1990).

For the same reasons, the Plaintiffs' reliance on *South Carolina v. Regan, supra,* must fail. In *South Carolina,* the Court carved an extremely limited exception to the bar of the Anti–Injunction and Declaratory Judgment Acts, opening the courts only to parties in pre-enforcement tax disputes "for whom [Congress] has not provided an alternative remedy." 465 U.S. at 378, 104 S.Ct. at 1114. In *South Carolina,* the Court permitted the action to proceed because that State could not protect its interests in issuing tax-exempt bearer bonds through a refund suit or in the Tax Court. In this action, the Plaintiffs may protect their own interests and could defeat the claimed tax deficiency in a refund action after the taxes are assessed and collected. Plaintiffs also could obtain Competent Authority assistance under the Treaty after the Tax Court issues its final ruling. As explained above, the alleged higher costs to proceeding in a Tax Court action before invoking the Treaty are too speculative to justify extraordinary relief. If the Court were to accept such speculation as a basis for overriding the Anti–Injunction and Declaratory Judgment Acts, the entire tax collection scheme would be disrupted.